CITED *in Schenck* v. *Griffin,* 9 *Vr.* 471.

THE STATE (J. B. COLES AND OTHERS, PROSECUTORS,) v. JESSE PLATT, COLLECTOR OF JERSEY CITY.

1. An assessment of taxes in Jersey City to " the estate of J. B. Coles, deceased," where a large estate is shown to have been well known by that designation, is not such an error as would authorize the court to set aside the tax on *certiorari.* Whether a sale of the lands under such assessment would convey title, *quere ?*

2. Under the charter of Jersey City, lands within the city which have been laid out on maps by the owners in building lots, are properly assessed as lots, although not marked out or designated on the ground as lots ; and such lots are properly assessed at their value in the market as building lots.

3. The court, on *certiorari,* will not correct an overvaluation of property by the assessor, where it is not so excessive as to show partiality or misconduct in the officer : the remedy is by appeal only.

4. It is not error to assess all the lots in one block, when they belong to the same owner, at one sum in gross, without distinguishing each, even when they are of different value.

5. That part of the land taxed lies below high water, or even below low water mark, does not, of itself, vitiate the assessment, for although such land was originally in the state, yet it may have been granted by the state, and it is susceptible of ownership.

6. The mistake of an assessor in omitting to assess taxable property does not set aside or invalidate the whole assessment, unless it is such a plain disregard of the directions of the law as to throw the burthen of taxation upon persons and property in a different direction from that intended by the law.

7. Assessors in Jersey City cannot add any sum to the amount directed to be raised to cover losses and contingencies.

This was a *certiorari,* prosecuted by John B. Coles and others, devisees of John B. Coles, deceased, to review and cor-

rect the assessment of taxes made by the assessors of Jersey City, in the year 1851, upon the lands of the prosecutors.

Upon the return of the *certiorari*, a rule was taken by the prosecutors to take affidavits. From the affidavits taken under it, the following facts appeared : that John B. Coles, deceased, owned a tract in the present limits of Jersey City of about 300 acres, of which about fifty had been sold; that the same had been laid out in blocks and lots, by a map made by J. F. Mangin, in 1804, by authority of J. B. Coles and others, under whom he derived title, and by which he and his devisees had sold parcels of said tract; that part of said tract assessed for taxes lay below high water mark and a small part below low water mark ; that such part was claimed by prosecutors, and part of it sold by them for $100,000 since the assessment.

There was in Jersey City about $100,000 worth of property belonging to religious societies, consisting of churches, and the lands surrounding them, which had not been assessed by the assessor. The lands of the prosecutors had been valued by the assessor in parcels, as they lay in blocks, and were valued at what the assessors thought would be the selling price of the lots, which prices did not exceed the price at which the prosecutors were selling single lots in like situations. The assessed value amounted to about one million of dollars. The agent of the prosecutors testified that he did not think that the property could have been sold for $400,000 in 1851, and that the actual rent was only $1515. The tax directed to be raised by the common council, in 1851, was $35,000. To this the assessors added the sum of $4172, the share of the county tax apportioned to the city, and also the sum of $2458.98, added by themselves, for losses and contingencies, amounting, without the poll tax of $4500 (no part of which was assessed on the prosecutors), to $41,530.98.

From the return to the *certiorari*, it appeared that the property of the prosecutors had not been assessed to them by name, but to "the estate of J. B. Coles ;" and that the same, although chiefly lying together in one tract, had not been assessed as one tract, but in different parcels, as the same was situate on streets and in blocks, and that it was assessed by

lots, not singly but grouped together, as they were in different blocks, as " 10 lots in block 209," without giving the numbers of the lots, or valuing them separately.

The reasons relied on for reversal were—

1. That the taxes were not assessed in the name of any person as owner, but to the estate of J. B. Coles.

2. Because a large contiguous tract had been assessed in lots.

3. Because land under water had been assessed.

4. Because each lot taxed was not designated and valued separately.

5. Because the assessors fixed an imaginary value upon the lands, and did not value them according to their actual rents and profits.

6. Because the assessors assessed more tax than authorized by law.

7. Because the assessors purposely and unlawfully omitted to assess the lands of others that were liable to be assessed for this tax.

Argued before the CHIEF JUSTICE and Justice HAINES and ELMER, by *Whitehead* and *Dayton,* for the state, and *Vroom* and *Zabriskie,* for the defendant.

*Whitehead,* for plaintiff.

The assessments in Jersey City are wholly regulated by the city charter of 1851. *Pam. Laws* 392, § 44, p. 409, title 5.

This tax is not assessed upon any one by name, either as owner or occupant, it is upon " the estate of J. B. Coles." The act provides that a warrant may issue against the body of the owner; how can this be unless he is named ? Taxes are a lien; land may be sold, and purchasers will hold against the owner or owners.

The assessment is confused ; you cannot designate what lots are assessed, or how much on each. It is not taxed as a whole tract, but is divided up into 3000 lots. It assesses " part of block 53," without saying which lots, or how many. This assessment is in violation of § 44 of the charter, which requires the *number* of lots or parcels of land to be designated.

The property is grossly overvalued. E. Coles testified that, in 1851, it would not have brought $400,000, yet it is valued at one million of dollars. The rents of vacant lots were $615, and of the four brick houses $900, in all $1515, yet the tax was $4673.92.

The provisions of the act must be complied with, or the proceedings and sale under it will be held void. 4 *Wheat.* 77; 7 *Cowen* 88.

The assessors did not assess the churches in Jersey City, valued at $100,000. It is an error in principle, which increases the burthen of the prosecutors, and according to the decision of this court, in the case of *The State* v. *Branin,* 3 *Zab.,* it will set aside the assessment.

The addition made by the assessors for losses and contingencies is without authority and void.

*Zabriskie,* for defendant.

This *certiorari* removes all the assessments against the estate of John B. Coles, amounting to $4673.92, a large proportion of the city tax, and the question is, shall this whole assessment be set aside, and the estate relieved from all taxes in 1851.

The assessment will be presumed to be right until shown to be wrong. In the cases in *Wheaton* and *Cowen* it was a question of title to land, and the claimant under a tax sale was held to show that all the proceedings were according to law.

The first objection is, that the taxes are not assessed to the owners by name, but to "the estate of John B. Coles;" the fact is so. Counsel *assume* that the name of the owner must be stated. This must depend upon general principle or statute. There is no such *general principle;* none is pretended—no authority is or can be given for it.

It must, then, depend upon statute, which is in this case the charter of Jersey City. Section 44, paragraph 3, regulates it; this does not require the name of the owner. The state tax law does require the *name of owner,* but there is a reason for it; that makes the tax only a personal duty, not a lien upon the lands.

Nor does the charter require it by implication. True it authorizes a warrant against the body. The only consequence is that *this remedy* may be defeated; it does not make void the assessment. This warrant is nugatory against a corporation and against a non-resident, but there is no implication from this that the assessment of lands of corporations and non-residents is illegal.

It is said that the 4th section requires the name of the owner to be advertised. If so this is only directory. 3 *Mass.* 230, *Pond* v. *Grafton;* 21 *Pick.* 75, *Williams* v. *School District;* 20 *Ib.* 418, *Alarick* v. *Collin.*

But even if it might defeat the title of the purchaser and the remedy by sale, it does not avoid the assessment.

The second objection is, that it is assessed in lots, not in one parcel. This is not contrary to the statute. It requires the number of lots *or* parcels to be designated. The quantity owned by the prosecutors in each block may well be assessed as a parcel; and the number of lots, where each lot is well understood to be 25 feet by 100, will designate the quantity as well as acres; and that different lots in one parcel are of different values makes no more difficulty than the assessment in gross of a farm of 100 acres in the country, where some parts are double in value to the others, would make.

The third objection is, that lands below high and low water mark are assessed, and that these, by law, belong to the state. The answer to this is, that these lots are susceptible of being made private property; for aught that appears, the state may have sold it to the prosecutors; they claim it and sell it, and it does not appear that they disclaimed the ownership before the commissioners of appeal. The burthen of proof, when the fact *may be* either way, was upon the plaintiff in *certiorari.*

As to the value of the land, no overvaluation is proved; it is not beyond the selling price of the prosecutors in 1851. That they could not have sold one million of dollars' worth of lots at one sale for their full value, is perhaps true.

The omission of the churches in the assessment cannot set aside all other assessments. No assessment would stand if

every mistake of an assessor of law or fact, by which taxes are raised, would annul it. 21 *Pick.* 75; 6 *Metc.* 497.

*Dayton* cites 6 *Wheat.* 119, *Thatcher* v. *Powell;* 4 *Pet.* 152, *Beatty* v. *Lessor of Knowles;* 4 *Hill* 76, *Sharp* v. *Spier.*

*Vroom,* for defendant.

1. Is assessment void because to " estate of J. B. Coles." There is no practical inconvenience shown; no pretence of any error in fact; estate is as certain as " heirs " or " devisees." Who are the heirs, may be doubtful in fact; who are the devisees in a will, may be doubtful in law: it may be doubtful if there is a good or valid will. To whom or how, in such case, is land to be assessed. Medeef Eden's estate in New York was in dispute twenty years. The assessor cannot settle titles. The case of *Sharp* v. *Spier,* in 4 *Hill* 76, turns upon a departure from the express directions of the statute. 1 *R. S.* 391.

A mistake in the name of the owner will not vitiate an assessment. 20 *Pick.* 418, *Alvord* v. *Collin;* 10 *Wend.* 346, *Wheeler* v. *Anthony,* 6 *Wheat.* 319.

2. It is objected that this property ought not to be assessed in lots, but as a whole. Lots in a city have a definite meaning, more than in the country. And the charter of Jersey City directs the lands to be assessed in lots or parcels. It is sufficient to say that this has been complied with.

3. It is alleged that these lands are taxed above their value. But, in the first place, this cannot be corrected on *certiorari,* but only by the commissioners of appeal. And in the second place, it is not sustained by the evidence.

4. Another objection urged is, that lands are taxed that lie under water. Counsel do not pretend, and cannot pretend, that this land is not susceptible of ownership, nor do they deny here that the prosecutors owned this land; they only state it as a proposition, that land under water cannot be taxed. Land under water can be owned by individuals, and these prosecutors claim this.

*Dayton,* in reply,

It has been maintained in the argument that the court must deal liberally with the assessment; that the laying a land owner's part of the expenses of the government that protects his land, like a remedial act, must be viewed liberally, and that the acts of officers must be presumed right, until shown to be wrong. The reverse of this is the rule of law; where special power to raise taxes is conferred great strictness is required. 4 *Peters* 359.

This assessment is void for uncertainty, both as to the *person* and the *thing* assessed.

Look at all parts of the act. Section 44 requires " the num- of lots or parcels of land assessed to each person " to be designated. How can this be if no person named? The assessor is to make a personal demand of each delinquent. It provides that the body of the delinquent shall be taken to jail. 8 *Wheat.* 681, *Washington* v. *Pratt.*

Every thing essential to the assessment must be in writing; it cannot be eked out.

The cases where assessments have been held good without the name of owner are cases where there was no personal remedy, but the only proceeding was *in rem.*

The property assessed is also uncertain. The charter says the number of lots or parcels must be designated; it is not like a farm, upon which the taxes are no lien.

Can they assess marsh land that never can be made building lots as building lots? The assessor says he valued the lots in the same block at different prices, and yet the assessment gives only the value of the block. The amount assessed to each lot cannot be ascertained; a purchaser or mortgagor of any lot could not ascertain how much was assessed to his lot. 4 *Hill* 92; 4 *Pet.* 349; 2 *Barb. S. C.* 344, *Dike* v. *Lewis;* 1 *Scamm.* 345, *Garret* v. *Higgins;* 4 *Ib.* 144, *Hill* v. *Leman;* 1 *Ib.* 70, *Fink* v. *Pinchard.*

By the supplement of tax law, passed March 26, 1852, this court have no power to correct errors like this; the assessment must be set aside. 4 *Halst.* 19; 2 *Green* 401.

The opinion of the court was delivered by

ELMER, J. The first ground relied on for setting aside the assessment in this case is, that the taxes are not assessed to any person or persons by their proper names, but are assessed to "estate of J. B. Coles," and in some cases to "estate of Coles." The property assessed is land situate within the limits of Jersey City. No form of assessment is prescribed by law. It has been a common practice in different parts of the state, where land is untenanted and the precise owners are unknown, to assess the tax to the heirs of the last known owner, and sometimes to the estate of such person. No objection has hitherto been made to this, although it is, perhaps, not strictly correct. The Supreme Court of New York, in the case of *Wheeler* v. *Anthony*, 10 *Wend.* 346, held a tax assessed to the "widow and heirs of Zophar S. Wheeler" to be sufficient. And in the case of *Ronkendorff* v. *Taylor*, 4 *Peters* 349, an assessment in Washington City to "Henry Toland's heirs" seems to have been considered legal.

It appears, by the depositions read in evidence, that this particular property has been assessed in the same manner several years, and the taxes paid without objection; and it is said that there would be some difficulty in naming the persons who are interested in it. Edward Coles, one of the witnesses examined, states that he is the agent of the estate of J. B. Coles, deceased; and it is evident the property is well known, and commonly designated as the estate of J. B. Coles, or of Coles.

The argument most relied on to show that this mode of assessment is illegal was, that unless some person is named, the provisions of the charter and of the general tax laws cannot be carried out. If the tax is not paid, those laws authorize a tax warrant to issue to levy the tax by distress and sale of the goods and chattels of the delinquent, and in case goods and chattels cannot be found, to take the body of such delinquent, and deliver the same to the sheriff, or his jailor, to be kept in safe and close custody until payment be made of the tax, with costs. It does not follow, however, that we are bound to set aside the assessment as wholly illegal and void because it may happen that some of the means authorized to be used for col-

lecting the tax cannot be made effectual. In the cases of assessments against corporate bodies, this provision is not applicable; and it may be that no delinquent can be taken to jail, unless his proper name is inserted in the tax list and warrant.

By the third section of the "act regulating the proceedings of courts in cases of taxation," (*Acts of* 1852, *p.* 527,) it is enacted, that no return of taxes or list of delinquents shall be set aside or reversed, on *certiorari* or otherwise, for any lack of form which does not impair the substantial rights of the plaintiff in *certiorari*. The substantial rights of the prosecutors of this *certiorari*, I am satisfied, have not been, and will not be impaired by the lack of form in naming them. If they cannot be imprisoned, or even if no good title can be made for their land, should it be sold, they will not be injured. The agent of these prosecutors it appears furnished one of the maps used in making the assessment, and the tax list shows on its face what particular property is assessed. No difficulty was experienced in taking an appeal. Without meaning to be understood that the mode of assessment adopted in this case is strictly correct, or to intimate any opinion in regard to future proceedings which may be taken to collect the tax, I am of opinion that the assessment ought not to be set aside on account of the lack of form in naming the persons assessed.

Another class of exceptions to this assessment, relates to the manner of making it by lots or blocks, and to the mode in which they were valued. The land assessed in lots consists of about 250 acres, about two-thirds of which was originally salt meadow, through which a creek runs and there are numerous salt ponds, much of which remains in its original state unimproved, and a considerable part of it enclosed by a fence, and used as meadow. It is all assessed as building lots, even that part which lies between the high and low water marks of the river. This mode of assessment and valuation, it is insisted, is not warranted by the facts of the case, and the valuation, it is alleged, is imaginary and exorbitant.

The charter provides that the assessors (there being two, who acted jointly,) "shall assess all real estate and chattels situate in the city, both of residents and non-residents, by

valuing the same at its true full fair value, designating the number of lots or parcels of land and the value of personal chattels which they assess to each person." Lots are here specially referred to, and the number owned by each person is required to be designated. This specific direction was probably occasioned by the fact, that long before the passing of this charter, and before the incorporation of "the associates of the Jersey Company," which was the title of the first corporate body, the site of the city was surveyed and laid out into squares and lots, with streets and avenues, and a map of the survey made by one Mangin, which was afterwards adopted by the associates, and left by them in the office of their clerk, and in subsequent conveyances it was recognised and continually referred to. This map was recognised, and the dedication of land thereby made to the public use sustained as valid and binding by this court in the case of *Den* v. *Dummer, Spencer* 86. The assessment was made of lots as laid down on this map, now nearly fifty years old, except a small portion assessed by another map, furnished to the assessors by the agent of the owners, and which had been made use of at an auction sale of some of the property. Indeed I think it may fairly be inferred that the assessment in lots was made with the approbation of the agent, or at least with his knowledge, and without objection at the time.

The streets and avenues, as laid down on the maps, do not appear to have been formally adopted by the corporation; but they are regarded as dedicated to the public, and some of them have been improved at the public expense. Many of them have never been opened or marked on the ground, and some of them that cross the meadows will require to be filled up at a heavy expense. Many of the lots will also require expensive filling up, and some must be cut down very considerably. Sales have been made of lots interspersed in different parts of the tract; and whenever sales are made it is done by the maps before referred to. The lots are valued at different prices, according to their present condition and their situation.

All the circumstances shown in evidence satisfy me that in

assessing this property the assessors followed the directions of the charter. The lots were all such as had been long known and recognised as lots by the proprietors and the public and by the city authorities. In many cases they were not actually designated on the ground, but they were so designated on maps of a public character as to be easily found, and their true, full, fair value ascertained. Other parts of the city were assessed by the same map and in the same manner, and such has been the practice.

But it is objected that the value placed on this property is imaginary and exorbitant. There are about three thousand lots, and the value exceeds a million of dollars. If rightly assessed as lots, as I think they were, they were of course to be valued as lots, and such was the intention of the charter. The city is rapidly extending, and every improvement made in it tends directly to enhance the value of the lots, so that in justice they ought to contribute their fair proportion of those expenses which make the city desirable as a residence and quickens its growth. If overvalued, the remedy of the owners was by an appeal to the commissioners selected for the purpose of revising the estimate of the assessors, and this remedy they availed themselves of. It is certainly shown that the present income of the property bears no comparison to the interest of the money at which it is valued. But the income is not the criterion; and it is not shown that they are valued beyond the true, full, fair value of them, certainly not so far beyond it as to show such partiality and misconduct in the officers as would justify us in holding the assessment to be wholly void. The lots were not valued so high as the price at which they are held, and are not valued higher than other property in the city in a similar condition.

Many of the lots appear to be assessed collectively, that is to say a block of lots containing a designated number is assessed at a round sum, being the collective value of all the lots included in the block. It is insisted that, if assessed as lots, the assessment ought to show the particular value of each lot. Whether a block of lots is assessed at a round sum in cases where the lots contained in the block are not all of the same

value, does not distinctly appear. But admitting it to be so, I am not of opinion that the assessment is therefore erroneous.

The act requires only that it designate "the number of lots or parcels assessed to each person." It is not required that each lot shall be separately valued. Such is not the law or the practice in assessing under the general tax law. The necessity of doing so under the charter of Jersey City is inferred from the provisions of the forty-eighth section. By that section, the taxes are made a lien upon the lands, tenements, and real estate assessed, and the common council may cause them to be sold at public auction for the shortest term for which any person will agree to take them and pay the tax, with interest and costs, first advertising the sale and describing them, with the proviso that the property, as sold, may be redeemed by the owner, mortgagee, or occupant, or persons interested therein, within two years, by paying the purchase money and subsequent taxes, together with interest at the rate of fifteen per cent. per annum. Unless each lot is separately taxed and sold, it is said there can be no proper description of the property, and there can be no redemption by a person who may happen to have a mortgage covering only one or more lots. As to the description of the property, all that is assessed to any one individual can be as easily described, and sold to pay all his tax, as a part to pay a part; and as to redeeming, it is obvious that the same difficulty may occur, let the assessment be made either in the one way or the other. Only a part of a lot or parcel may be mortgaged, or one mortgage may cover several lots, a part of which are embraced in another mortgage, and difficulty may thus arise in determining who may redeem. But it is not necessary to solve such difficulties now; very probably some may occur that cannot be solved at all by a court of law, if even a court of equity can remove them. Unless the law, by express direction or by necessary implication, requires each lot to be assessed and valued separately, it does not follow, as I have already suggested, that the assessment is void and must be set aside because it may happen in a particular case that some of the modes prescribed for collecting the tax cannot be made use of. If the property cannot be sold, which

I do not mean to intimate, the owners will not be prejudiced by the defect that hinders such a proceeding. The assessment, as made, is exceedingly voluminous and minute, and, indeed, is much objected to on that account. To require a separate and distinct assessment of each lot in the city, improved or unimproved, would render it still more so, and, as it seems to me, without any corresponding benefit.

A part of the property is admitted to be land lying below the high water mark of the Hudson river, and a part is below the low water mark. This property is not liable to assessment, it is said, because such property belongs to the state, and not to individuals. The answer to this question is, that allowing it to be *prima facie* the property of the state, still it is possible the state may have granted it to the persons who are taxed for it, or to some one from whom they purchased. It is clear that it is claimed to belong to the estate of J. B. Coles. The agent did not disclaim the ownership when it was assessed, nor upon the appeal. A considerable part of · it has been actually sold and conveyed as the property of the Coles since the assessment.

Another objection to this taxation is, that when it was made the churches within the limits of the city were not in terms exempted from taxation by the charter, and, although shown to be of the aggregate value of one hundred thousand dollars, they were not assessed. Meeting houses and school houses, although not formally exempted by the tax laws in force prior to 1851, were seldom if ever assessed in any part of the state. This omission was so obviously proper, and so entirely in accordance with the public sentiment, that it universally prevailed, and was in fact a contemporaneous construction of the laws this court would probably have sanctioned, had the question been formally raised. When the new system was adopted, the exemption was for the first time expressly enacted ; and although not contained in the charter of Jersey City, I do not think the omission to tax the churches such an illegality as ought to render the whole assessment void.

It would be a novel and dangerous doctrine to hold, that if the assessors happen to omit some property really taxable, the

assessment is thereby necessarily void, so that no taxes can be collected. There is, perhaps, scarcely a district in the state where this does not happen, to a greater or less extent, almost every year. It is undoubtedly the duty of the assessor to include all the property liable to be taxed; but unless it be in cases involving a palpable and greatly injurious disregard or misconstruction of plain requirements of the law from the necessity of the case, this is a matter which must be left to his own vigilance. In the case of *The State* v. *Branin,* this court held that an omission to assess a poll-tax vitiated the whole assessment; but in that case there was not a mere omission to assess some particular individuals or property, there was a flagrant misconstruction of the law, affecting every taxable inhabitant, very different in its character from the case before us. In the case of *Williams* v. *School District,* 21 *Pick.* 75, the Supreme Court of Massachusetts held that an omission would not invalidate an assessment. The same principle was affirmed in the case of *George* v. *Inhabitants, &c.,* 6 *Metc.* 497.

The only valid objection I find to this assessment is, that the assessors included in it the sum of $2458.98 for losses and contingencies. Fifteen hundred dollars were ordered to be assessed, by the ordinance of the council, for contingent expenses, as by the charter they were authorized. But this additional sum is illegal. It must, therefore, be referred to a commissioner to ascertain what is the prosecutor's proportion of this sum, and to that extent the assessment must be set aside, and as to all the rest affirmed.